Debra CONNOLLY and Douglas Connolly, Parents and Natural Guardians of Brooke Connolly, Plaintiffs,

v.

AETNA U.S. HEALTHCARE, INC., Health Maintenance Organization of New Jersey, Inc., n/k/a Aetna U.S. Healthcare, Inc., Camden County Obstetrics and Gynecology a/k/a Women's Health Associates, Larry S. Rosen, M.D., Paul J. Zinsky, M.D., and Sally S. Park, Executrix of the Estate of Richard C. Park, Defendants.

No. 03–1814 (JBS).

United States District Court, D. New Jersey.

Aug. 25, 2003.

Michael Barrett, Esquire, Mary Gidaro, Esquire, Saltz, Mongeluzzi, Barrett & Bendesky, PC, Cherry Hill, NJ, for Plaintiffs Debra Connolly and Douglas Connolly.

Edward S. Wardell, Esquire, Kelley, Wardell & Craig, LLP, Haddonfield, NJ, for Defendant Aetna U.S. Healthcare, Inc. and The Health Maintenance Organization of New Jersey, n/k/a Aetna U.S. Healthcare, Inc.

## OPINION

SIMANDLE, District Judge.

Plaintiffs Debra Connolly and Douglas Connolly, the parents and natural guardians of Brooke Connolly, a minor, original-

ly filed this complaint in New Jersey state court, alleging that defendants Aetna U.S. Healthcare, Health Maintenance Organization of New Jersey, Camden County Obstetrics and Gynecology, Larry S. Rosen, M.D., Paul J. Zinsky, M.D., and/or Richard C. Park, M.D., were negligent in rendering treatment to Debra Connolly while she was pregnant with Brooke Connolly, a quadriplegic, who now suffers from permanent disabilities, including cerebral palsy and brain damage. The issue before the Court is whether the claims of plaintiffs, who concede that they were not entitled to certain benefits under Debra Connolly's employee benefits plan, arising out of Aetna's medical decisions defining a course of treatment, is directed to Aetna in their capacity as an arranger of medical treatment, or as an administrator of benefits.

The case was previously removed to federal court by Aetna, and Judge Joel A. Pisano remanded back to state court on July 23, 2001. Though trial was to commence on May 12, 2003, the case was again removed to this Court by Aetna on April 24, 2003, after certain expert depositions were conducted. Presently before the Court is the motion to remand by plaintiffs. For the reasons stated herein, the motion to remand will be granted.[1]

## I. BACKGROUND

Plaintiff Debra Connolly received prenatal care from defendants Camden County OB/GYN, Dr. Larry S. Rosen, Dr. Paul J. Zinsky, or Dr. Richard C. Park, beginning in or around February 19, 1993 pursuant to her Macy's employee benefit plan under ERISA. (Second Amended Compl., Pl.'s Ex. A, ¶¶ 13, 22.) Defendant Aetna U.S. Healthcare, Inc., is a Pennsylvania corporation which owned a subsidiary corporation known as The Health Maintenance

Organization of New Jersey, Inc. ("HMO New Jersey"). Plaintiff Debra Connolly received her medical treatment through HMO New Jersey, a health maintenance organization organized by Aetna U.S. Healthcare, as provided to plaintiff through her participation in an ERISA-covered welfare plan sponsored by her employer, Macy's. Debra Connolly received obstetric care directly from defendant physicians through HMO New Jersey and not from Aetna. (Second Amended Compl. ¶¶ 21–44.) Thus, Aetna plays two roles in this context: one as administrator of health benefits, the other as arranger of medical treatment through its wholly-owned subsidiary HMO New Jersey. Moving defendants Aetna and HMO New Jersey will hereinafter be referred to as "Aetna" or "defendant," unless otherwise specified.

On April 14, 1993, Debra Connolly was seen by either Dr. Rosen, Dr. Zinsky, or Dr. Park for a physical examination, which detected fetal heart tones. (Id. ¶ 23.) On May 14, 1993, defendant physicians saw plaintiff at Camden County OB/GYN, at the 20 weeks gestational age. (Id. ¶ 24.) At that visit, an ultrasound previously performed upon Debra Connolly showed that she was carrying twins, and no fetal abnormalities were noted. (Id. ¶ 25.) On May 27, 1993, plaintiff was seen by defendant physicians for an examination, where fetal heart tones were observed, and plaintiff's cervix was noted to be long and closed. (Id. ¶ 27.) Plaintiff also saw defendant physician on June 10, 1993 and June 18, 1993. (Id. ¶¶ 28, 29.) A week later, an ultrasound was conducted, which indicated Twin A to be 25.3 weeks gestation, and Twin B (Brooke Connolly) to be 26.2 weeks gestation. (Id. ¶ 30.) Twin A

---

1. Defendant Aetna also moves for summary judgment. Due to the remand to the New Jersey Superior Court, that motion will be dismissed.

weighed 800 grams, and Twin B weighed 900 grams. (*Id.*)

On July 2, 1993, Debra Connolly complained to either Dr. Rosen, Dr. Zinsky or Dr. Park that she felt vaginal pressure. (*Id.* ¶ 31.) An examination was conducted, indicating that plaintiff had positive fetal movement, was at 34 weeks size, was unable to feel contractions, and her cervix was noted to be finger-tip dilated and 40% thinned out. (*Id.* ¶ 32.) Plaintiff was prescribed the medication Brethine 2.5 mgs every 6 hours. (*Id.* ¶ 33.)

On July 2, 1993, either Dr. Rosen, Dr. Zinsky, or Dr. Park called Aetna U.S. Healthcare to obtain a home uterine activity monitor for pre-term contractions and history of pre-term cervical dilation. Although Aetna did not approve the home uterine activity monitor for Debra Connolly because she did not fall within the exceptions of the Perinatal Policy,[2] it did approve Home Uterine Palpation through a nursing company called Baby Focus, Inc., which provided nurse visits to the patient's home to teach her to palpate her own uterus and feel contractions, as well as telephone contact on a daily basis to monitor signs of labor.[3] (Second Amended Compl. ¶¶ 35, 36.) On July 3 and 4, 1993, plaintiff and a nurse from Baby Focus, Inc., had telephone contact whereupon plaintiff attempted to palpate and count her contractions. (Second Amended Compl. ¶¶ 37, 38.) After counting an increased number of contractions on July 5, 1993, plaintiff was admitted to West Jersey Hospital on July 6, 1993 by defendant Dr. Zinsky with a principal diagnosis of preterm labor precautions. (*Id.* ¶¶ 39, 40.) After treatment with tocolytic agents and IV fluids, Debra Connolly was discharged on July 6, 1993. (Second Amended Compl. ¶¶ 42, 43.) Dr. Rosen then called Aetna to obtain coverage under Macy's benefit plan for home uterine activity monitoring for Debra Connolly's preterm contractions. (*Id.* ¶ 44.) Aetna again did not approve the request because it was not a covered benefit under the plan.

---

2. That policy provides:

> Although DME is not a covered service, and the use of this equipment is still controversial in the obstetrical community, the Perinatal Q.A. Committee of U.S. Healthcare has made an exception under 3 specific criteria. They are as follows:
> 1. Under FDA approval. The FDA has approved the monitor for women who have had previous pre-term deliveries. (This is defined as any delivery prior to 37 weeks gestation [3 weeks before the EDC]). The FDA also dictates the monitor be used at or after 26 weeks gestation.
>
> . . . . .
>
> 2. Triplets or more.
> 3. Documented uterine anomalies. Such as: T-shaped uterus (as with DES exposure), bicornuate uterus, double uterus, etc. The benefit is not extended to cervical anomalies (incomplete cervix).

Perinatal Policy, Pls.' Ex. N. Aetna denied this request because a home uterine activity monitor is not a covered benefit under Macy's benefit plan. (De. Connolly Dep., Def.'s Sum.

J. Ex. A, at 24–29, 46–47, 116–18, 125, 142; Do. Connolly Dep., Def.'s Sum. J. Ex. D, at 42, 52, 54.) Under Aetna's Perinatal Policy, Debra Connolly did not fall within the criteria for exceptional cases in which a home monitor would be provided, *i.e.*, she did not have a previous history of preterm labor and was not expecting triplets. (De. Connolly Dep., Def.'s Sum. J. Ex. A, at 29.)

3. Debra Connolly's employee benefit plan provided health care benefits, including plan covered inpatient hospital stays and specialist services in obstetrics. (Group Master Contract, Def.'s Sum. J. Ex. B, §§ II.B.5, II.C.) The Macy's plan did not cover durable medical equipment. (*Id.* §§ III.A, III.A.13.) A home uterine activity monitor is a piece of durable medical equipment which is attached to a pregnant woman's abdomen to measure uterine activity. (Cohen Dep., Def.'s Sum. J. Ex. E, at 15–16.) Thus, a home uterine activity monitor is not a covered service under the benefit plan and is not eligible for payment. (*Id.* at 76; Group Master Contract, Def.'s Sum. J. Ex. B, § III.A.13.)

On July 11, 1993, plaintiff reported to Baby Focus that she was having bloody secretions. (*Id.* ¶ 46.) Plaintiff alleges that she called Dr. Rosen at Camden County OB/GYN and was told not to come in for an examination until the next day. (*Id.* ¶ 47.) On July 12, 1993, plaintiff was examined and it was noted that she was fully dilated at 29 weeks. (Second Amended Compl. ¶ 48.) That same day, Debra Connolly was transferred to the West Jersey Hospital where she was in unstoppable labor and underwent a low forceps delivery of Twin A and a Caesarean section delivery of Twin B because of bradycardia and breach presentation. (*Id.* ¶ 49.) Twin A died after birth from necrotizing enterocolitis. (*Id.* ¶ 50.) Twin B, Brooke Connolly, had periventricular leukomalacia, respiratory distress syndrome and grade 1 intraventricular hemorrhage due to prematurity, and she continues to be treated for severe disabilities presently. (*Id.* ¶ 51.)

On or about February 15, 2001, plaintiffs filed a Complaint in New Jersey Superior Court, Camden County, Law Division, alleging state law claims of negligence, medical negligence and gross negligence. (Pls.' Motion to Remand, Pls.' Ex. D, at 1.) On April 6, 2001, defendant Aetna filed a Notice of Removal to federal court pursuant to 28 U.S.C. §§ 1331 and 1441(a)-(c), contending that plaintiffs' claim alleging that Aetna denied plaintiffs' request for benefits pursuant to an employee benefit plan presented a federal question falling within the scope of § 502(a) of ERISA. (First Notice of Removal, Pl.'s Ex. C, ¶¶ 6, 7.) The first removal was docketed at Civil Action No. 01–1643(JAP). On May 4, 2001, plaintiffs filed a motion to remand based on the fact that plaintiffs' state law claims were directed to the quality of benefits provided and therefore were not completely preempted by ERISA. (Pls.' Motion to Remand, Pls.' Ex. D.) On July 23, 2001, Judge Pisano entered an Order re-manding the case to New Jersey Superior Court. (J. Pisano Order, Pls.' Ex. F.) In an oral opinion, Judge Pisano stated the following:

> First of all, following the guidance in *Pryzbowski* discussing *Pegram,* going back to language I discussed, I need to determine whether or not this claim challenges the administration of or eligibility for benefits. And on the facts of this case, I find that it does not. This is a plan which provides for a benefit and the benefit was given. So, this is not a claim which challenges the eligibility for a benefit or administration of a benefit. Because it is clear that the … benefit for which Mrs. Connolly was eligible was administered. Rather there is a claim which is stated and I have to … read the plain language in the complaint under the well pleaded complaint rule, I have to determine whether or not the plaintiff has alleged a removable claim, a federal claim, and he has not. What he has alleged is that the policy was determined as a result of improper analysis. And in order—getting into your argument could this have been brought under 502(a). In order for me to have decided this in a 502(a) proceeding, I would necessarily have to get into the judgment that went into drafting and formulation of the plan. All of this being said, it seems to me that as it has been pled by the plaintiffs in this case, *this is a claim which concerns the quality of medical treatment after you get to the essence of it,* and for that reason, I do not find this case to be compelled by *Pryzbowski.* I find it to be distinguishable from *Pryzbowski* and, therefore, Motion for Remand is going to be granted on that basis.

(Tr. 7/23/01 in Civil Action No. 01–1643, Pl.'s Remand Mot. Ex. E (emphasis added).)

Plaintiffs then filed their Second Amended Complaint in New Jersey state court on June 19, 2002, alleging that defendants Aetna U.S. Healthcare and Health Maintenance Organization of New Jersey were negligent in the implementation and adoption of the policy for treatment of women having contractions and history of pre-term cervical dilation and are vicariously liable for the actions and conduct of defendant physicians (Count I); that Aetna and HMO New Jersey's actions constitute reckless indifference and provide grounds for punitive damages (Count II); that Aetna and HMO New Jersey were negligent in adopting policies regarding hospital utilization and in selecting, supervising, training and/or monitoring defendant physicians and Camden County OB/GYN (Count III); that defendants Camden County OB/GYN, Dr. Rosen, Dr. Zinsky, Dr. Park were negligent in ordering Home Uterine Palpation through "Baby Focus" and in failing to provide adequate medical advice and failing to advise plaintiff to go to the hospital to receive immediate medical attention (Count IV); and that such negligence by defendant physicians and Camden County OB/GYN constitutes grounds for punitive damages (Count V).[4] (Second Amended Compl., Pls.' Remand Mot. Ex. A.)

On December 2, 2002, the Superior Court entered a Consent Order signed by both parties indicating that partial summary judgment was entered in favor of defendant Aetna and HMO New Jersey with respect to the portion of Paragraph 58 of Count I of the Second Amended Complaint which contains the claim for "vicarious liability for the actions and conduct of Defendants Larry S. Rosen, M.D., Paul Zinsky, M.D., Richard C. Park, M.D. and/or Camden County OB/GYN who are

acting as its agents." (Order, 12/2/02, Def.'s Sum. J. Ex. B.) The Order also entered summary judgment in favor of defendant on Count III of the Second Amended Complaint. (*Id.*) The Order specified that it was not determining or entering judgment with respect to plaintiffs' direct negligence claims in Count I and punitive damages in Count II. (*Id.*)

Following remand, the parties proceeded with discovery and a trial was scheduled to commence on Monday, May 13, 2003. During discovery, depositions of former medical directors, nurses and case managers were conducted. At the close of discovery, plaintiffs produced the expert report of John C. Morrison, M.D., dated November 26, 2002, which stated,

[I]t is my opinion, within a reasonable degree of medical certainty, that Aetna U.S. Healthcare was negligent in the creation, formulation and application of its 'Perinatal Policy' resulting in the refusal to provide home uterine activity monitoring to Ms. Connolly. Furthermore, it is my opinion to a reasonable degree of medical certainty that, had she received home uterine activity monitoring as her physicians recommended, the pregnancy could have been extended for a significant period of time thus allowing both babies to survive intact and avoiding the death of one twin and the neurologic damage noted in the second child.

(Morrison Report, Pls.' Remand Mot. Ex. G.) At his deposition taken on April 14, 2003, when asked whether plaintiffs had requested coverage for a home uterine activity monitor, Dr. Morrison testified that they had done so twice. (Morrison Dep. Tr., Pls.' Mot. Remand Ex. K, at 10–11.) In addition, Dr. Morrison testified to the following:

---

**4.** Because defendant Dr. Richard C. Park is deceased, plaintiff's complaint is brought against Sally S. Park, Executrix of the Estate of Richard C. Park, M.D.

Q: And is it your understanding that Aetna U.S. Healthcare denied coverage for the home uterine activity monitor?

A: Yes.

Q: And is it your opinion in this case that Mr. and Mrs. Connolly, or their infant child, suffered some damage as a result of Aetna U.S. Healthcare's denial of their request for coverage for a home uterine activity monitor?

A: Yes.

(Morrison Dep. Tr., Pls.' Mot. Remand Ex. K, at 11.) When asked whether he intended to testify to any opinions other than those set forth in his report, Dr. Morrison replied, "No. I think this outlines my opinions pretty succinctly." (*Id.* at 54.) At the end of the deposition, Dr. Morrison provided the following testimony:

Q: Doctor, I am correct, am I not, that you are not and you have not provided any opinions either in your report or here today regarding Aetna U.S. Healthcare's denial of a benefit. Correct?

A: Yes, sir.

Q: I am correct?

A: Yes.

Q: And, in fact, Doctor, isn't it true that you have provided the opinion here today to Mr. Wardell in response to his questions that Aetna U.S. Healthcare's perinatal policy was negligent and deviated from the accepted standard of care for failure to include home uterine activity monitoring for twin pregnancy and instances of preterm labor within a particular pregnancy?

A: Correct.

(*Id.* at 104–05.)

On April 14, 2003, defendant Aetna U.S. Healthcare filed a second Notice of Removal, pursuant to 28 U.S.C. §§ 1441(a), (b), and (c), 28 U.S.C. § 1446(b), and 29 U.S.C. § 1132(d), on the ground that plaintiff's expert's testimony provides that plaintiffs' claim against Aetna seeks damages allegedly caused by Aetna's denial of coverage for a home uterine activity monitor, which is within the scope of Section 502(a) of ERISA. (Second Notice of Removal, ¶ 30.) Plaintiffs filed this motion for remand pursuant to 28 U.S.C. § 1447(c) on June 17, 2003. Defendant Aetna filed a motion for summary judgment, also on June 17, 2003. This Court heard oral argument on the remand motion on July 25, 2003.

## II. *DISCUSSION*

Plaintiff seeks remand of this case to New Jersey Superior Court on grounds that Dr. Morrison's deposition testimony does not constitute an amended pleading and/or paper within the meaning of 28 U.S.C. § 1446(b) (and thus did not give rise to removal), and that plaintiffs' claim against Aetna is not preempted by ERISA. Plaintiffs also argue that they are entitled to recover costs and attorneys' fees in bringing this motion.

### 1. *Plaintiffs' Motion to Remand*

 Plaintiffs filed this motion to remand pursuant to § 1447(c), which provides in pertinent part that "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c). The removal statutes " 'are to be strictly construed against removal and all doubts should be resolved in favor of remand.' " *Boyer v. Snap-on Tools Corp.*, 913 F.2d 108, 111 (3d Cir.1990) (quoting *Steel Valley Auth. v. Union Switch & Signal Div.*, 809 F.2d 1006, 1010 (3d Cir.1987)), *cert. denied*, 498 U.S. 1085, 111 S.Ct. 959, 112 L.Ed.2d 1046 (1991). A party who removes a case bears the burden of proving that jurisdiction exists. *See Boyer*, 913 F.2d at 111.

2. *"Other Paper" Under 28 U.S.C. § 1446(b)*

Plaintiffs first assert that Dr. Morrison's deposition does not constitute an amended pleading and/or paper within the meaning of 28 U.S.C. § 1446(b). That section provides that notice of removal shall be filed within thirty days after receipt of an initial pleading setting forth the claim for relief, and that:

> If the case stated by the initial pleading is not removable, *a notice of removal may be filed within thirty days after receipt by the defendant,* through service or otherwise, of *a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable,* except that a case may not be removed on the basis of jurisdiction conferred by section 1332 of this title more than 1 year after commencement of the action.

28 U.S.C. § 1446(b) (emphasis added).

As plaintiffs indicate, the Third Circuit has not addressed the issue of whether deposition testimony of an expert witness or other person constitutes "other paper" satisfying § 1446(b). The majority of courts that have considered this issue have held that a plaintiff's answers to deposition questions can constitute "other paper" for purposes of the statute. *See Peters v. Lincoln Elec. Co.,* 285 F.3d 456, 465–66 (6th Cir.2002) (holding that "plaintiff's responses to deposition questioning may constitute an 'other paper' under Section 1446(b)"); *Huffman v. Saul Holdings Ltd. P'ship,* 194 F.3d 1072, 1078 (10th Cir.1999) (adopting majority rule that "a discovery deposition does satisfy the requirement");

*Effinger v. Philip Morris, Inc.,* 984 F.Supp. 1043, 1047–48 (W.D.Ky.1997) ("The majority of courts have held that a discovery deposition constitutes a[n] 'other paper' within the meaning of 28 U.S.C. § 1446(b).") (collecting cases).

Plaintiffs argue that deposition testimony may only constitute "other paper" if it is a "voluntary act by plaintiff," citing to *Brinkley v. Universal Health Servs., Inc.,* 194 F.Supp.2d 597 (S.D.Tex.2002). *Brinkley* is unpersuasive, as the case on which *Brinkley* relies for this proposition, *S.W.S. Erectors, Inc. v. Infax, Inc.,* 72 F.3d 489, 494 (5th Cir.1996), held that an affidavit based entirely on defendant's subjective knowledge was insufficient to convert a non-removable action into a removable one, *Infax,* 72 F.3d at 494, and the Fifth Circuit did not explicitly hold that a voluntary action by the plaintiff was required.

Not all circuit courts mandate a requirement that the "other paper" derive from a "voluntary act by the plaintiff." *See, e.g., Huffman,* 194 F.3d at 1078 (deposition of plaintiff's economist expert indicating that the case satisfied diversity jurisdiction requirements constituted "other paper" under § 1446(b)); *Effinger,* 984 F.Supp. at 1047 ("The majority of courts have held that a discovery deposition constitutes a 'other paper' within the meaning of 28 U.S.C. § 1446(b)."). Nor does this case, unlike *Infax,* present a situation in which removal was based on defendant's own subjective declarations. Rather, plaintiffs' expert Dr. Morrison testified that it was his understanding that plaintiffs requested coverage for a home uterine activity monitor twice, and that Aetna denied coverage for the home uterine activity monitor.[5]

---

**5.** Specifically, the testimony provides:

Q: Is it your understanding in this case that Mr. or Mrs. Connolly, or the physicians acting on their behalf, requested coverage for a home uterine activity monitor?

A: Yes, they requested it twice.

Q: And is it your understanding that Aetna U.S. Healthcare denied coverage for the home uterine activity monitor?

A: Yes.

*See* Morrison Dep. Tr., Def.'s Opp. to Remand Ex. E, at 10–11. The information elicited during Dr. Morrison's deposition serves the purpose of the removal statute, which is "to 'make sure that a defendant has an opportunity to assert the congressionally bestowed right to remove upon being given notice in the course of the case that the right exists.'" *Huffman,* 194 F.3d at 1078.

Because Dr. Morrison's deposition testimony gave notice to defendant that plaintiffs' claim may raise a federal ground, such testimony constitutes "other paper" for purposes of § 1446(b). Plaintiffs' motion to remand will not be granted on this ground.

### 3. *Complete Preemption Under § 502(a)(1)(B) of ERISA*

Under the well-pleaded complaint rule, federal question jurisdiction exists only when an issue of federal law appears on the face of the complaint. *Pryzbowski v. U.S. Healthcare, Inc.,* 245 F.3d 266, 271 (3d Cir.2001). Complete preemption, an exception to the well-pleaded complaint rule, occurs when Congress so pervasively occupies a particular field (here, benefit enforcement claims under ERISA) that "any complaint that comes within the scope of [a] federal cause of action necessarily 'arises under' federal law," and is completely preempted. *Id.* (quoting *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal.,* 463 U.S. 1, 9–10, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)). Congress has manifested an intent that § 502(a) of ERISA, which creates an exclusive, comprehensive federal enforcement scheme for plan participants, should have extraordinary preemptive force, and causes of action within the scope of § 502 are removable to federal court. *Pryzbowski,* 245 F.3d at 273 (*citing Metro. Life Ins. Co. v. Taylor,* 481 U.S. 58, 66, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987)). Section 502(a) of ERISA allows a beneficiary or participant of an ERISA-regulated plan to bring a civil action

> to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

29 U.S.C. § 1132(a)(1)(B). "Under § 502, a beneficiary may obtain accrued benefits due, a declaratory judgment about entitlement of benefits, or an injunction to require the administrator to pay benefits." *Pryzbowski,* 245 F.3d at 272 (citing *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 53, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987)). The Supreme Court has determined that Congress intended the complete-preemption doctrine to apply to state law causes of action which fit within the scope of ERISA's civil enforcement provisions. *See Metro. Life,* 481 U.S. at 66. State law claims which fall outside the scope of § 502 are still governed by the well-pleaded complaint rule, and, therefore, are not removable under the complete-preemption principles established in *Metropolitan Life. See Dukes,* 57 F.3d at 355 (citing *Franchise Tax Bd.,* 463 U.S. at 23–27, 103 S.Ct. 2841). The Third Circuit articulated the test to be applied in determining whether

---

Q: And is it your opinion in this case that Mr. and Mrs. Connolly, or their infant child, suffered some damage as a result of Aetna U.S. Healthcare's denial of their request for a home uterine activity monitor?
A: Yes.

Q: And is it that the basis on which you issued your reports and opinions in this case?
A: Correct. It's contained on the second page, I believe, of my report.

Morrison Dep. Tr., Def.'s Opp. to Remand Ex. E, at 10–11.

complete preemption under § 502 of ERISA exists:

> [T]he ultimate distinction to make for purposes of complete preemption is whether the claim challenges the administration of or eligibility for benefits, which falls within the scope of § 502(a) and is completely preempted, or the quality of the medical treatment performed, which may be the subject of a state action.

*Pryzbowski*, 245 F.3d at 273.

In a number of cases, the Third Circuit has elaborated upon this quality/quantity of care distinction. *See Dukes v. U.S. Healthcare, Inc.*, 57 F.3d 350 (3d Cir.1995) (quality of benefits claims do not fall within Section 502(a)(1)(B), whereas claims challenging the quantum of benefits due under an ERISA-regulated plan are completely preempted under ERISA's civil enforcement scheme); *In re U.S. Healthcare, Inc.*, 193 F.3d 151 (3d Cir.1999) (classifying HMO's adoption of a policy of discharging newborn infants within 24 hours after delivery as a medical determination not preempted under Section 502(a)(1)(B)); *Lazorko v. Pennsylvania Hosp.*, 237 F.3d 242 (3d Cir.2000) (holding that the denial of a beneficiary's request for hospitalization for mental illness occurred in the course of treatment, and was therefore not preempted).

Plaintiffs argue that their claim against Aetna is a state law professional malpractice claim directed to the quality of medical care provided to Debra Connolly based upon a "Perinatal Policy" that was negligently formulated, implemented and applied by defendant. Plaintiffs cite to *DeLucia v. St. Luke's Hosp.*, No. Civ. A. 98–6446, 1999 WL 387211 (E.D.Pa. May 25, 1999), for support. In *DeLucia*, plaintiff, who had a history of pregnancy losses and family history of congenital heart disease, was discharged from the hospital after being advised that her newborn son did not meet the criterion for being discharged with a breathing monitor. Aetna removed the case, alleging that plaintiffs' claim was for denial of benefits under § 502 of ERISA and that their claims related to a union benefit plan within the meaning of § 514 of ERISA. In that case, plaintiff did not allege that Aetna denied a request for a breathing monitor, or that the baby's condition met the plan's criterion for a breathing monitor, or that a breathing monitor was a covered benefit under the plan. Because complete preemption was inapplicable where a plaintiff did not allege that the denied or omitted medical treatment or service was due them under the plan, *see id.* at *3 (citations omitted), the court granted plaintiffs' motion for remand, finding that plaintiffs' complaint did not seek damages for a denial of a benefit due.[6]

---

**6.** Other courts in cases decided before *In re U.S. Healthcare*, where the plaintiff similarly did not allege that the denied or omitted medical treatment or service was due under the plan, also found that complete preemption does not apply. *See DeLucia*, 1999 WL 387211, at *3 (citing *Miller v. Riddle Mem. Hosp.*, No. CIV. A. 98–392, 1998 WL 272167, at *5–*6 (E.D.Pa. May 28, 1998)); *Hoose v. Jefferson Home Health Care, Inc.*, No. 97–7568, 1998 WL 114492, at *3–*4 (E.D.Pa. Feb. 6, 1998). In *Hoose*, plaintiff alleged state tort claims based on medical care he received that resulted in a below the

knee amputation, and later an above the knee amputation, wherein despite attempts by plaintiff's physicians to transfer him to a rehabilitation hospital, the health maintenance organization did not authorize the transfer. Although defendant had argued that the allegations in the complaint showed that plaintiff was in fact denied a benefit and therefore his claim fell within the scope of § 502(a)(1)(B), the court, relying upon the *Dukes* decision, reasoned that plaintiffs had nowhere alleged in the counts in the complaint that the HMO refused to authorize the transfer to a rehabilitation hospital, nor had

In this case, plaintiffs allege in their Second Amended Complaint that Aetna acted negligently by adopting and implementing its Perinatal Policy with respect to home uterine activity monitoring (Count I), that defendants Camden County OB/GYN, and Doctors Rosen, Zinsky, and Park were negligent in their medical treatment of Debra Connolly (Count IV), and that such reckless conduct is grounds for punitive damages (Counts II and V). *See* Second Amended Compl., Pls.' Ex. A, ¶¶ 54–57, 61–65, 69. Specifically, with respect to Aetna and HMO New Jersey, plaintiffs allege in Count I that:

54. On or about July 2, 1993, pursuant to a policy promulgated and implemented by Defendants, U.S. Healthcare, Health Maintenance Organization of New Jersey, Defendants, Larry S. Rosen, M.D., Paul J. Zinsky, M.D. and/or Richard C. Park, M.D., prescribed Home Uterine Palpation through a program called "Baby Focus, Inc.", for Debra Connolly's contractions and history of pre-term cervical dilation.

55. On or about July 6, 1993, pursuant to a policy promulgated and implemented by Defendant, U.S. Healthcare, Defendants Larry S. Rosen, M.D., Paul J. Zinsky, M.D. and/or Richard C. Park, M.D., prescribed Home Uterine Palpation through a program called "Baby Focus, Inc.", for Debra Connolly's contractions and history of pre-term cervical dilation.

56. This U.S. Healthcare policy encouraged, pressured, and/or directly or indirectly required that participating physicians prescribe Home Uterine Palpation for a pregnant woman, such as Debra Connolly, who have contractions and a history of pre-term cervical dilation, instead of other more reliable treatments, such as hospitalization or a Home Uterine Monitor.

57. In adopting and implementing this policy for the treatment of pregnant women having contractions and a history of pre-term cervical dilation, Defendant, U.S. Healthcare, acted without adequate consideration of whether this policy was medically appropriate, and thus acted negligently and without due care for the health and safety of its members and their children, including Debra Connolly, Douglas Connolly and Brooke Connolly.

58. At the time Debra Connolly was prescribed Home Uterine Palpation through "Baby Focus" she was having difficulty in determining whether or not she was having contractions. A Home Uterine Monitor would have detected those contractions which Debra Connolly was unaware she was having. As a

---

plaintiffs alleged anywhere in the complaint that "treatment at a rehabilitation facility was a benefit *due him under the terms of a plan* with USH and that USH specifically denied him that benefit." *Id.* at *3–4. Thus, the court held that plaintiffs' state law claims fall outside the scope of § 502(a)(1)(B). Although plaintiffs had indeed alleged that the HMO had refused to authorize the transfer, the court stated that these allegations merely provided background to plaintiffs' causes of actions, and also that nowhere in the eight counts of the complaint had plaintiff alleged that defendant insurer refused to authorize a transfer to a rehabilitation hospital.

The district court in *Miller* also held that state law claims of plaintiff, who had requested to be admitted to a skilled nursing facility but was discharged to her home, did not fall within the scope of § 502(a)(1)(B), despite defendant's argument that plaintiff's allegations attacked "an administrative decision to deny a benefit due Plaintiff under the Plan—treatment at a skilled nursing facility." *Miller*, 1998 WL 272167, at *5. The court reasoned that "nowhere in the Complaint does Plaintiff state that skilled nursing care is a benefit due her under the Plan.... Instead, the Complaint is replete with allegations that the quality of medical care Plaintiff received was inadequate [.]" *Id.* at *5.

proximate result of U.S. Healthcare's direct negligence in, among other things, adopting and implementing its policy for the treatment of women having contractions and a history of pre-term cervical dilation, ... Debra Connolly's pre-term labor went undiagnosed and untreated, which resulted in unstoppable labor on July 12, 1993, which caused Brooke Connolly to be born premature on July 12, 1993, at 29 weeks gestation, and as a result, Brooke Connolly suffered greatly and continues to suffer from permanent disabilities directly related to her premature birth as set forth more fully hereinafter.

59. As a result of the negligence of Defendant U.S. Healthcare, as aforesaid, Brooke Connolly was caused to sustain serious, disabling and permanent personal injuries ....

Second Amended Compl., Pl.'s Mot. Remand Ex. A, ¶¶ 54–57.

As in *DeLucia,* nowhere in their Second Amended Complaint do plaintiffs allege that Aetna denied a request for a home uterine activity monitoring program, that plaintiffs' condition met the plan's criterion for home uterine activity monitoring, or that a home uterine activity monitoring program was covered by the plan. While plaintiffs allege that their physicians called Aetna to "obtain for Debra Connolly Home Uterine Monitoring for pre-term contractions and history of pre-term cervical dilation," they state that Aetna "approved Home Uterine Palpation through a program called 'Baby Focus, Inc.'" *Id.* ¶¶ 34, 35, 44. The care Debra Connolly received was prescribed by her doctors pursuant to the policy promulgated by Aetna. *Id.* ¶¶ 54, 55. No reference to a denial of benefits is made. Rather, with respect to Aetna, plaintiffs allege that Aetna's adoption and implementation of the policy for treatment of pregnant women having con-

tractions and pre-term cervical dilation constitutes negligence and substandard medical treatment. Plaintiff's complaint seeks damages due to defendants' arrangement for providing medical treatment, which they allege falls below the standard of medical care. Similar to *DeLucia,* where plaintiffs do not allege that defendant denied them a benefit due under the plan, plaintiffs' complaint "cannot be read to allege that Aetna made an administrative decision to deny a benefit due under the plan." *DeLucia,* 1999 WL 387211, at *3.

Defendant at oral argument asserted that the test for complete preemption is whether a request for benefits was made and denied, which it asserts was done in this case, citing to *Pryzbowski.* The Third Circuit in that case did state that "a claim alleging that an HMO declined to approve certain medical services or treatment on the ground that they were not covered under the plan would manifestly be one regarding the proper administration of benefits ... [and] is completely preempted and removable on that basis." *Id.* at 273 (citing *Dukes,* 57 F.3d at 356). The Third Circuit relied on its previous decision in *Dukes* for this statement, where it specifically noted that a claim that the plan erroneously withheld benefits due would be completely preempted. *See Dukes,* 57 F.3d at 356. In *Dukes,* the Third Circuit contrasted such a situation with plaintiffs' state law claims alleging medical malpractice against a health maintenance organization, hospitals and medical personnel, which the Third Circuit stated "merely attack the *quality* of the benefits received[.] The plaintiffs here simply do not claim that the plans erroneously withheld benefits due." *Id.* (emphasis in original).

Similarly, plaintiffs' claim in this case is not that defendant erroneously withheld benefits due them. Rather, plaintiffs con-

cede that defendant's denial of the home uterine monitor was consistent with the terms of defendant's allegedly flawed Perinatal Policy. Section III.A.13 of the Macy's Master Group Contract provides that "durable medical equipment," which includes home uterine activity monitoring, is not a benefit under the contract signed by Debra Connolly. The Perinatal Policy lists the criterion for providing home uterine activity monitoring in exceptional cases:

Although DME is not a covered service, and the use of this equipment is still controversial in the obstetrical community, the Perinatal Q.A. Committee of U.S. Healthcare has made an exception under 3 specific criteria. They are as follows:

1. Under FDA approval. The FDA has approved the monitor for women who have had previous pre-term deliveries. (This is defined as any delivery prior to 37 weeks gestation [3 weeks before the EDC]). The FDA also dictates the monitor be used at or after 26 weeks gestation.

 . . . . .

2. Triplets or more.
3. Documented uterine anomalies. Such as: T-shaped uterus (as with DES exposure), bicornuate uterus, double uterus, etc. The benefit is not extended to cervical anomalies (incomplete cervix).

Perinatal Policy, Pls.' Remand Mot. Ex. N. Given that the home uterine activity monitor is not a benefit provided under the plan, plaintiffs' complaint does not seek recovery of benefits due Debra Connolly,

nor could it properly allege that Debra Connolly was denied a benefit provided to her by the plan. Because plaintiffs attack the quality of the medical care received, their claim falls outside the scope of § 502(a)(1)(B).

This conclusion is further strengthened by the purpose of ERISA and its civil enforcement scheme under § 502, as explained by the Third Circuit:

Congress sought to assure that promised benefits would be available when plan participants had need of them and § 502 was intended to provide each individual participant with a remedy in the event that promises made by the plan were not kept.

*Dukes*, 57 F.3d at 357. Here, plaintiffs could not benefit from recourse under § 502's civil enforcement remedies of ERISA, such as seeking a declaratory judgment about entitlement of benefits, or an injunction to require the administrator to pay benefits. No remedy could be afforded to plaintiffs because the plan had provided the services it promised to plaintiffs, that is, the home uterine palpation through Baby Focus. Thus, defendant's argument that plaintiffs could have pursued their rights under § 502 "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan," 29 U.S.C. § 1132(a)(1)(B), is inapplicable because a home uterine activity monitor was not a covered benefit, and plaintiffs had already received the benefit to which they were entitled.[7]

---

7. Judge Pisano also expressed doubt as to plaintiffs' ability to receive relief through the § 502 enforcement scheme, as he stated at the first oral argument for motion to remand:

The Court: Let's assume as a hypothetical Mr. Barrett had been consulted at the time, which I'm sure hadn't been, but let's as-

sume Mrs. Connolly is smart enough to call a lawyer when she's having clearly a difficult pregnancy, she decides if at some point for whatever reason rather than to call a doctor, she called a lawyer. How does this claim—how is this claim brought? She brings an action, hypothetically, in federal

Moreover, to the extent that defendant asserts that deposition testimony demonstrates that plaintiffs made a request for a benefit which was subsequently denied, removal is governed by the well-pleaded complaint rule, under which "a cause of action 'arises under' federal law, and removal is proper, only if a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Dukes*, 57 F.3d at 353 (citing *Franchise Tax Bd.*, 463 U.S. at 9–12, 103 S.Ct. 2841); *Pryzbowski*, 245 F.3d at 271. Defendants' citation to Dr. Morrison's deposition testimony as evidence that plaintiffs requested a benefit and was denied that request is not dispositive of the issue. It is part of the chronology; it is not the cause of action. The relevant question, rather, is whether, on the face of the plaintiffs' properly pleaded complaint, a federal question is presented. Nowhere on the face of plaintiffs' complaint do they present a question of federal law. The entirety of plaintiffs' Second Amended Complaint alleges only state law claims of negligence against defendant Aetna for its medical decisions defining a course of treatment Debra Connolly received, which were then implemented by the treating physicians, and the complaint is not removable as a result.

Furthermore, even though Dr. Morrison testified in his deposition that plaintiffs had requested coverage for a home uterine activity monitor twice and were denied, this does not indicate that plaintiffs necessarily seek relief for such actions in their complaint, or that their complaint should be completely preempted on that factual basis. For example, there are situations in which a plaintiff may allege claims for both a denial of benefits due under the plan and negligence in the medical care she receives. As the Third Circuit stated in *Dukes* with respect to plaintiffs' state law medical malpractice claims in that case, "The plaintiffs are not attempting to define new 'rights under the terms of the plan'; instead, they are attempting to assert their already-existing rights under the generally-applicable state law of agency and tort." *Dukes*, 57 F.3d at 358. In the hypothetical described above, while the first claim would be preempted by ERISA, the latter would remain viable. Because state law medical malpractice claims emanate from tort principles, rather than contract, the fact that plaintiffs requested certain benefits and were denied here does not obviate their claims for state law negligence.[8]

Notwithstanding Dr. Morrison's testimony, Aetna's conduct as an arranger of medical treatment here is distinctly different from its conduct as a plan administrator, as demonstrated in *In re U.S. Healthcare, Inc.*, 193 F.3d 151 (3d Cir. 1999). In that case, plaintiff brought, *inter alia*, a direct negligence claim against U.S. Healthcare for its adoption and implementation of its policy of presumptively discharging newborns within 24 hours, and a negligence claim against U.S. Healthcare for its adoption of policies which encouraged physicians to discharge newborns and also discouraged physicians from readmitting infants after discharge when the appropriate standard of care re-

---

court and the carrier is providing me, the HMO is providing me with a benefit that is in the plan. I think it's a bad policy. The policy is the result of an unprofessional judgment call, and I want you to rewrite the plan to see to it that I get a different

sort of medical care. Is that the way it comes out?
Tr. 7/23/01, Pl.'s Mot. Remand Ex. E, at 19.

8. In any event, Dr. Morrison's testimony does not demonstrate that plaintiffs were denied a "benefit" due to plaintiffs under the plan.

quired otherwise under state law.[9] The Third Circuit held that both claims were not completely preempted because they were directed to the HMO's actions in "arranging for medical treatment" rather than its role as plan administrator determining which benefits were appropriate. With respect to plaintiffs' first negligence claim, the Third Circuit stated that "it is the HMO's essentially medical determination of the appropriate level of care that the Baumans claim contributed to the death of their daughter." *Id.* at 163. The Third Circuit explained that plaintiffs' second claim sought "recovery for decisions that U.S. Healthcare made in providing and arranging medical services, decisions that adversely influenced the medical judgment of its participating physicians." *Id.*

Although defendant argued otherwise at the oral argument, plaintiffs in this case similarly allege that, *inter alia,* defendant's policy "encouraged, pressured, and/or directly or indirectly required that participating physicians prescribe Home Uterine Palpation for a pregnant woman[.]" Second Amended Compl., Pls.' Remand Mot. Ex. A, ¶ 56. Plaintiffs' negligence claim regarding implementation of the Perinatal Policy likewise is directed to defendant's medical determination of the appropriate level care to be given in certain situations. As with *In re U.S. Healthcare,* plaintiffs here seek recovery for decisions Aetna made in providing and arranging for certain courses of treatment in its provision of medical services, and their claims thus fall outside the scope of § 502(a) of ERISA.

The Third Circuit further discussed this distinction in *Pryzbowski v. U.S. Healthcare,* 245 F.3d 266 (3d Cir.2001):

> [I]n *In re U.S. Healthcare, Inc.,* we applied the quality-quantity distinction in determining whether claims by parents against U.S. Healthcare based upon the death of their newborn baby were completely preempted. In making that decision, we relied upon the distinction made in *Dukes* between "an HMO's role in 'arranging for medical treatment' rather than its role as a plan administrator determining what benefits are appropriate." We held that U.S. Healthcare's adoption of a policy of discharging newborn infants within 24 hours after their delivery was essentially a medical determination that could be subject to a state law medical malpractice action. We also held that the HMO's alleged negligence in selecting, training, and supervising medical personnel implicated the quality of medical treatment. Therefore we concluded that none of the claims were completely preempted and we directed that the case be remanded to state court.

*Pryzbowski,* 245 F.3d at 272 (delay in approving surgery involved defendant's role as plan administrator, and plaintiff's claims

---

**9.** Defendant at oral argument asserted that plaintiffs in *In re U.S. Healthcare* were entitled to a benefit of 72 hours hospital stay, yet received only 24 hours, after childbirth. While partial receipt of a benefit may implicate denial of a benefit by an HMO in its administrative capacity, there is no indication that plaintiffs in that case complained of the denial of benefits to which they were entitled, or that they requested a longer hospital stay but only received 24 hours. Neither the Third Circuit decision, nor the district court decision below, nor the defendant's appellate brief to the Third Circuit, make any reference that the benefit to which plaintiffs were entitled consisted of medical care under a policy of discharge 72 hours after childbirth, or that they requested 72 hours and received only 24 hours of hospital stay. The Court attributes such misstatement to inadvertent confusion of the facts. Even if there was an entitlement to a 72–hour benefit in *In re U.S. Healthcare,* it played no evident role in the analysis by the district court or Third Circuit.

were completely preempted). Because this case, similar to *In re U.S. Healthcare*, involves defendant's arranging for medical treatment of Debra Connolly under a policy that it adopted and implemented, and not the administration of benefits, defendant's policy is subject to state law medical malpractice action, and the state law claims for negligence are not completely preempted.

In conclusion, although defendant contends that plaintiffs seek to recover damages based on Aetna's denial of coverage for a home uterine activity monitor under Debra Connolly's plan, as revealed by Dr. Morrison's testimony, and thus their claims are completely preempted, the Third Circuit's holdings in *In re U.S. Healthcare* and *Pryzbowski* support plaintiffs' argument that their claims are directed at Aetna's provision of medical treatment and the quality of the care given, rather than the administration of benefits under the plan and the quantity of benefits awarded. There is no dispute that the home uterine activity monitor was not a benefit under plaintiffs' plan, which leads to the conclusion that plaintiffs' claim could therefore not be brought under § 502 of ERISA for recovery of benefits, as this benefit was not due them under the plan. Because defendant fails to satisfy its burden that removal was proper, *see Boyer*, 913 F.2d at 111, plaintiffs' motion for remand to New Jersey Superior Court will be granted.[10]

### 4. Costs and Attorneys' Fees

 Plaintiffs seek costs and attorneys' fees under 28 U.S.C. § 1447(c), which provides in relevant part:

> An order remanding the case may require payment of just costs and any actual expenses, including attorneys' fees, incurred as a result of the removal.

28 U.S.C. § 1447(c). As discussed above, plaintiffs' claims are factually and legally similar to those of *In re U.S. Healthcare* and *DeLucia,* the claims of which were not completely preempted, and distinguishable from *Pryzbowski.* Nonetheless, defendant's removal and this remand motion presented close questions which do not fit neatly into the quantity/quality distinction of applicable jurisprudence. On a close question, although removal turns out to have been incorrect, the Court may decline to award costs and attorneys' fees. *See Patterson v. Exxon Mobil Corp.,* 262 F.Supp.2d 453, 467 (D.N.J.2003) (citing *Eyal Lior v. Sit,* 913 F.Supp. 868, 878 (D.N.J.1996); *Shrader v. Legg Mason Wood Walker, Inc.,* 880 F.Supp. 366, 368 (E.D.Pa.1995)) ("Such an award of fees, incurred as a result of removal, lies in the

10. This Court's holding, that the Second Amended Complaint against Aetna contains no claim for health benefits under § 502 of ERISA and is therefore not within the removal jurisdiction of federal court, expresses no view on the merits of plaintiffs' state law medical negligence claim against Aetna. The claim that Aetna acted negligently in the exercise of medical judgment by adopting and implementing its Perinatal Policy with respect to home uterine monitoring is actionable if Aetna owed the Connolly's a duty of due care in adopting its policy of such coverage. If such a duty exists under New Jersey law, it does not, in this case, arise from any language in the contract, since Aetna has not agreed to reimburse for durable medical equipment with exceptions not applicable to Mrs. Connolly's circumstances. Similarly, the Second Amended Complaint does not appear to allege that Aetna was medically negligent in arranging for the Home Uterine Palpation services rendered by the nursing provider Baby Focus, Inc. Whether Aetna and HMO New Jersey undertook a medical duty, whether they breached that duty to plaintiff, and whether such breach was a proximate cause of harm to plaintiffs, will remain to be determined as matters of New Jersey law upon remand to the Superior Court, as this federal court is without jurisdiction to express an opinion.

discretion of the court, and does not require a showing of bad faith, nor that the removal was fruitless."); *see, e.g., Roxbury Condominium Ass'n, Inc. v. Anthony S. Cupo Agency,* 316 F.3d 224, 228 (3d Cir. 2003) (reversing award of attorneys' fees under § 1447(c) for remand based on untimely raised procedural defect as well as the district court's rationale based upon "area of unsettled law").

### III. *CONCLUSION*

Because plaintiffs' complaint alleges state law claims arising out of the substandard medical treatment provided to Debra Connolly and the implementation and adoption of a perinatal policy, rather than the administration of benefits or denial of benefits due Debra Connolly under her Macy's employee benefit plan, plaintiffs' claims are not completely preempted by § 502 of ERISA. Plaintiffs' motion for remand will therefore be granted, but plaintiffs' request for attorneys' fees and costs incurred as a result of removal will be denied. Defendant Aetna's motion for summary judgment will be dismissed. The accompanying Order will be entered.

### *ORDER*

THIS MATTER having come before the Court upon motion to remand to New Jersey Superior Court by plaintiffs Debra Connolly and Douglas Connolly, parents and natural guardians of Brooke Connolly, and upon defendant Aetna U.S. Healthcare, Inc. and The Health Maintenance Organization of New Jersey ("Aetna"); and the Court having considered the parties' submissions; and the Court having heard oral argument on the remand motion on July 25, 2003; and for the reasons stated in the Opinion of today's date; and for good cause shown;

IT IS on this 25th day of August, 2003, hereby

ORDERED that plaintiffs' motion to remand [Docket Item No. 7–1, 13–1] be, and hereby is, ***GRANTED***, and plaintiffs' Second Amended Complaint will be remanded to the New Jersey Superior Court, Camden County, Law Division, Docket No. L–1103–01; and

IT IS FURTHER ORDERED that plaintiffs' request for attorneys' fees and costs pursuant to 28 U.S.C. § 1447(c) be, and hereby is, ***DENIED***; and

IT IS FURTHER ORDERED that defendant Aetna's motion for summary judgment [Docket Item No. 6–1, 9–1] be, and hereby is, ***DISMISSED***.